

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00293-CV

———————————————————

IN THE INTEREST OF K.C., A CHILD

---

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 13088-JR-C

---

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

In two issues, K.C.'s Father[1] challenges the legal and factual sufficiency of the evidence to support the trial court's finding that terminating his parental rights is in K.C.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We affirm.

## Background

Father has a history of methamphetamine and other drug abuse and also incarceration. When K.C. was born in September 2016, Father was incarcerated for a drug offense. After Father was released to a supervised drug-treatment program, Mother brought the then-infant K.C. to visit him "every week to two weeks." Upon Father's release in summer 2017, he visited K.C. and Mother three to five times a week after he got off work. But after less than two months, before K.C.'s first birthday, Father was confined again on federal charges for conspiracy to possess methamphetamine with the intent to distribute it. He pleaded guilty, was convicted, and has been incarcerated for that offense ever since. His projected release date is in 2025, but he has been approved for a year-long residential drug-treatment program beginning in mid to late 2023.

When K.C. was around sixteen months old, the Department of Family and Protective Services removed her from Mother's care after Mother tested positive for

---

[1]K.C.'s Mother voluntarily relinquished her rights and did not appeal.

methamphetamine. K.C. and her half-brother[2] were placed with Mother's sister. After drug-test results for K.C. and her half-brother came back positive for methamphetamine, the Department filed suit seeking temporary managing conservatorship of K.C. and, alternatively, termination of Mother's and Father's parental rights.

After the Department filed suit, Father's paternity of K.C. was confirmed via genetic testing. The trial court ordered Mother and Father to work service plans. Neither completed the items required by their plans: Mother voluntarily relinquished her rights, and Father could not work many of the required items on his plan because of his incarceration. But Father was able to complete some parenting-related tasks and other classes in prison.

After a bench trial at which Father—who had appointed counsel—appeared via telephone, the trial court terminated Father's rights to K.C. On appeal, Father does not challenge any of the conduct-related grounds for termination, nor does he contend that we cannot consider evidence pertinent to those findings in this appeal. *See id.* § 161.001(b)(1)(D), (E), (Q). Instead, he contends that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

**Standard of Review**

To determine whether the evidence is legally sufficient in parental-rights-termination cases, we look at all the evidence in the light most favorable to the

---

[2]Father is not the father of K.C.'s half-brother.

challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

To determine whether the evidence is factually sufficient in such cases, we must perform "an exacting review of the entire record," *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014), but give due deference to the factfinder's finding and not supplant it with our own, *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest

4

analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

> (A)    the [child's] desires . . . ;
>
> (B)    the [child's] emotional and physical needs[,] . . . now and in the future;
>
> (C)    the emotional and physical danger to the child now and in the future;
>
> (D)    the parental abilities of the individuals seeking custody;
>
> (E)    the programs available to assist these individuals to promote the [child's] best interest . . . ;
>
> (F)    the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;
>
> (G)    the stability of the home or proposed placement;
>
> (H)    the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and
>
> (I)    any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted));

5

*E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## Evidence

### Father

Father testified that he had not been able to support Mother when she was pregnant with K.C. When he was out of prison in July and August 2017, he helped Mother out by buying clothes and diapers for K.C. He was not using drugs during that time. Even though Father saw Mother and K.C. several times a week during that time, he did not know that Mother was using drugs because Mother told him she was sober. But he knew Mother had been using drugs before that time, while he was in the supervised drug-treatment program, and he had told her family.

Father testified that he could not complete the court-ordered service plan while in federal custody, but he was engaged in "one-on-one" counseling twice per month. Father denied that K.C.'s caseworker had ever sent him the service plan. He also testified that his attorney had never sent him copies of the service plan or discussed it with him. When confronted with a letter he wrote the caseworker asking how to "go about cooperating with" his service plan, Father said that he wrote the letter because he had not received the service plan. Father also testified that although he had

6

attended the adversary hearing, he had not been given the opportunity to complete the tasks ordered at that time: a substance abuse assessment, psychological and psychiatric evaluations, and counseling.

But Father testified that he did complete "packets" that the caseworker had sent him. While incarcerated, he had taken a parenting class, a drug-education class, behavior and psychology classes, physical-education classes, and classes on hobbies.

According to Father, he was trying to be a better father, husband, and son, as well as a productive member of society who did not succumb to recidivism. Specifically, the hobbies-related courses—although not directly related to parenting— showed him a better way of spending his free time rather than doing drugs or getting in trouble with friends, which would make him a better father. They also showed him how to spend time with K.C. doing productive things like drawing or teaching her how to plant things. Physical-education classes helped him get his mind clearer; he also felt healthier. Father testified that he had learned better parenting skills, such as how to handle tantrums and how to teach his daughter healthy ways of dealing with emotions.

He had not seen K.C. very much and agreed that it was fair to say that she might not know who he is. When asked how he would be able to parent K.C. while in prison, Father explained:

> I can write her letters. I can draw her things. Write her and express to her my feelings, that I miss her and that -- you know, try to express to her how sorry I am and how much I miss her and just let her know that

even though I'm not there that I still love her and I still have her best interests in mind and that I want to be able to earn my way back into her life and show to her along with the others that are in her life that I can be a successful father and a positive role model in her life when I come home.

Father admitted that he should have been more involved in K.C.'s life.

Father had written K.C. a letter "for when she grows up" but had not written any other letters to her. At first, he said he had not done so because he was instructed not to contact K.C., but he then admitted that he could have written her letters through the caseworker as an intermediary. When asked why he had written only one letter, Father explained, "It's been, like, a month since she sent me the letter saying it was okay for me to write through her to [K.C]."

K.C. will be six or seven when Father is released from incarceration for his federal offense. He believed she was doing well in her foster placement.

Once released from prison, Father planned to attempt to be rehired at his old job or to take a job in "any kind of construction," using the resources at the Texas Workforce Commission, temporary agencies, or "any kind of avenues that help[] or that will try to -- or companies that help felons get jobs."

Father had no problem with K.C.'s remaining placed with the foster family even after his release from prison, but he wanted to be part of her life: "I just want to be able to earn my way back in to visit and see her and -- and -- and play some part of role in her life." Father testified that although K.C.'s foster family "hate[d]" him and he could give the Department choices for other good placements, he did not want

8

K.C. being "bounc[ed] around" or fought over and would rather her stay with them where she is safe. Father knew the foster family wanted to adopt K.C., but he thought "custody could also establish stability too."

Even with K.C.'s living with the foster family, Father "[a]bsolutely" believed he could play a part in K.C.'s life:

> I want to get a job to be able to provide for her, be able to take her school clothes shopping, be able to do father activities with her, take her fishing or -- or -- or whatever she's interested in, to support whatever hobbies or habits that she has as long as they're productive, and -- and just show her that she deserves a father who cares about her and be able to work and support her and -- and just be part of her activities or games or cheerleading or anything that she's involved in.

He expressed an intention to engage in positive parenting, build K.C.'s self-esteem, discipline consistently, act as a role model, communicate with K.C., and spend time with her.

Father has children older than K.C. and admitted that he had not changed his behavior for them because he was still struggling with his addiction when he had the opportunity to parent them.

Father testified what he thought the effect on K.C. would be if his rights were terminated:

> Abandonment. I believe that she will suffer emotionally thinking that I don't love her if I'm not there. She needs me there to support her and show her that she deserves a father. She needs a father figure in her life to show her what healthy relationships are supposed to be like, that way she doesn't fall into a mind frame of thinking unhealthy relationships are what it's supposed to be like. Educationally, I'm supposed to be there to

9

support her. Activities, school, anything that she -- she's interested in or participates in, I'm supposed to be there to support her in those.

Although Father had been a drug user since adolescence, he did not think he would use drugs again, stating, "I know for myself that I was ready to quit and that . . . was the last straw for me and . . . I'm ready to change my life and . . . I'm ready to take forward steps to change my life and not to return to the situation." Father had learned that addiction is a lifelong problem. He wanted to be a licensed chemical-dependency counselor to help people with the skills he had learned. He also wanted to work with youth to teach them what he could have avoided.

**Caseworker**

K.C.'s caseworker had been assigned since the adversary hearing in March 2018. She testified that the only service plan items Father had completed, or at least provided her with documentation showing completion, were the parenting classes she had sent him. Those classes consisted of reading a monthly parenting article she sent him, summarizing it, and telling her how he could apply it to K.C. Along with the article, she sent him a monthly update on the case. She agreed that Father could not complete many of the items ordered in the service plan because of his incarceration.

The caseworker notified Father that he could send K.C. unlimited written correspondence through the Department; the trial court had ordered that he have no direct contact with K.C. when Father had tried to contact the foster family directly by phone.

10

Father was supposed to maintain monthly contact with the caseworker, but over seventeen months, he had contacted her only nine times. She had included self-addressed, stamped envelopes for that purpose in her monthly correspondence to him. Father had sent her one letter and one drawing for K.C. The caseworker did not believe Father had shown adequate parenting skills despite his incarceration.

The caseworker was not aware of any steps Father had taken to develop a relationship with K.C. He had had little to no contact with her since her birth. And when the case first started, Mother told her that none of her children's fathers were involved with them.

The Department's permanence plan for K.C. was termination of rights with adoption. K.C. had lived with her foster family for over a year, and that family planned on adopting K.C. and her half-brother. The foster mother and father are Mother's sister and brother-in-law. They have three biological children. K.C. is bonded to the family and sees her foster parents as her mother and father.

The caseworker testified that K.C. would be emotionally endangered if the foster family adopted her half-brother without also being able to adopt her:

> I believe it's going to be confusing for her as she gets older, and I think it's always going to have that question of why, why she wasn't able to be adopted and her sibling was, and then the question of her permanency, of instability, where is she going to go, because she's not legally theirs. So, that's not necessarily a stable place if they just acquire [permanent managing conservatorship].

And if the foster family had to transfer out of state or if the parents got divorced, they could not take K.C. with them if they had not adopted her.

According to the caseworker, Father had told her he is bipolar and that there is a history of bipolar disorder in K.C.'s family. But to the caseworker's knowledge, Father did not take advantage of mental health counseling available to Wichita County jail inmates when he was being held there pending trial of his federal charges.

K.C. had no special needs. She had received early child-intervention services, but those had been discontinued because she had met her goals successfully. Although K.C. had some speech delays, all her needs were being met in her foster placement.

**Foster mother**

K.C.'s foster mother testified that she, her husband, and her three children lived in the home with K.C. and her half-brother. They loved her like one of their own children. Because she and her husband wanted to adopt K.C. and her half-brother at the same time, they had placed his adoption on hold. Her children called K.C. and her half-brother "brother[]" and "sister[]." K.C. called the foster parents "mom" and "daddy." K.C.'s foster family and half-brother did "everything" together as a family. They went to the park and Chuck E. Cheese, took vacations, and played games together. The foster parents had also maintained contact with K.C.'s other brothers and sisters.

Both foster parents had stable employment.

Before coming into the foster parents' care, K.C. would overfeed herself; she did not know how to use utensils, but she had learned how to do so. K.C.'s speech had improved. She had been weaned from a bottle to a cup and was potty trained. According to the foster mother, K.C. smiled a lot more and acted like a kid.

The foster mother had gotten two calls from Father. He wanted to know how K.C. was, but she told him to talk to the caseworker because the court had ordered him not to contact K.C. She testified that he had threatened to take K.C. to Hawaii upon his release from prison.

K.C.'s foster mother testified that if the court did not order adoption, K.C. would be left in limbo. She did not want K.C. to feel different from the other children in the house. She did not believe granting Father any type of custody would be in K.C.'s best interest because he had never been there for K.C., and she wanted K.C. to grow up with a father in the home. She was scared that after Father was released from prison, he could try to modify custody and take K.C. away. She also believed it would negatively impact K.C. to have her father pop back into her life. She believed it was in K.C.'s best interest to terminate Father's rights.

## Analysis

Although the *Holley* factors are not exclusive, in this case, they provide a more than adequate roadmap for analyzing the evidence.

**Child's desires**

K.C. was not old enough to articulate her desires. The evidence shows that she likely does not know who Father is and had not had any interaction with him for almost two years. She was bonded to her foster family, where she lived with her biological half-brother and was considered a sibling of the foster parents' children. She called her foster parents mom and daddy. This evidence weighs in favor of termination. *See, e.g.*, *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *4 (Tex. App.—Fort Worth Dec. 12, 2019, no pet.) (mem. op.); *In re A.R.*, No. 02-18-00311-CV, 2019 WL 1186963, at *7 (Tex. App.—Fort Worth Mar. 14, 2019, pet. denied) (mem. op.); *In re K.O.*, 488 S.W.3d 829, 840 (Tex. App.—Texarkana 2016, pet. denied); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g).

**K.C.'s emotional and physical needs, and emotional and physical danger to K.C, at time of trial and in the future**

Father contends that this factor weighs in his favor because K.C. is happy and healthy, has no special needs, and is in no danger from him due to his incarceration. But the evidence also shows that Father's drug use led to choices that resulted in his chronic, and eventually long-term, incarceration and that because of that incarceration, he was unable to protect K.C. from the effects of Mother's drug use. He will not be able to provide financial support for K.C. during his incarceration, and he would have very limited contact with her. Moreover, he will not be released until at

14

least 2023, at which time he will remain unavailable to parent K.C. while he is in a residential treatment program. Naming the Department permanent managing conservator during Father's incarceration, especially considering his lack of an established bond with K.C., interferes with the goal of achieving permanence and stability for her.

K.C.'s foster family wanted to adopt her. They were also going to adopt her brother. K.C. was part of the family, and they did not want her to feel different from any other siblings in the house. Both foster parents had steady employment and are experienced parents. The evidence supports the conclusion that they had been meeting, and would be able to meet, K.C.'s physical and emotional needs. *See, e.g., In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *6 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.); *In re R.A.G.*, 545 S.W.3d 645, 651–52 (Tex. App.—El Paso 2017, no pet.); *cf. J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short[]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."). Thus, this factor weighs against Father.

**Parenting abilities of persons seeking custody and available programs**

Father acknowledges that the evidence shows that his parenting skills are "questionable," but he argues that it also shows he has "learned invaluable lessons throughout the pendency of the case." Although Father had taken some classes while in prison and was able to articulate ways he could be a better parent to K.C., he had

not demonstrated an ability to do so while not incarcerated. He had not chosen to regularly write letters to K.C., nor had he shown a willingness to work toward establishing a bond with her through approved channels. And he threatened to take her away from the foster family. Moreover, the evidence shows that he has older children and that he was not able to maintain a drug- and crime-free lifestyle so that he could parent those children. The trial court could have concluded from this evidence that although Father may have developed a desire to act in K.C.'s best interest, he had yet to demonstrate an ability to do so.

Conversely, the evidence showed that the foster parents had biological children of their own, were planning to adopt both K.C. and her half-brother, and could support her financially as one of their own children. This factor thus weighs against Father. *See, e.g.*, *R.H.*, 2019 WL 6767804, at *5; *In re R.S.*, No. 02-18-00127-CV, 2018 WL 4183117, at *10–11, *15 (Tex. App.—Fort Worth Aug. 31, 2018, no pet.) (mem. op.); *In re J.L.C.*, 582 S.W.3d 421, 434 (Tex. App.—Amarillo 2018, pet. denied); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

**Plans for K.C. and stability of proposed adoptive home**

Father acknowledges that he is not currently able to provide a stable home for K.C. because of his incarceration. But he contends the evidence regarding his future plans for her is favorable to him because it shows that (1) he wants K.C. to live with the foster parents until he could establish a bond with her and provide for her and (2) his plan is to provide her with emotional support during his incarceration by

16

sending her letters, drawing her pictures, and telling her she has a father who made bad choices but who nevertheless loves her. When he is released, he plans to get a job, provide for K.C., and visit and support her while she lives with her foster family.

But Father acknowledged that the foster parents took care good care of and always provided for their children. He also acknowledged that although stability was important for K.C., he thought stability could occur via his plans for her.

The foster mother testified, conversely, that all of the children behaved like biological siblings, considered each other as such, and that they did not want K.C. to feel different if she were not adopted but her half-brother was. Additionally, Father had threatened to take K.C. away from the foster family to Hawaii. This adds to the concern for stability upon Father's release. And, contrary to Father's concerns, adoption of K.C. by the foster parents would provide K.C. with a permanent father–daughter relationship.

Both of these factors weigh against Father. *See, e.g.*, *In re A.M.*, 02-19-00023-CV, 2019 WL 3334420, at *15–16 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.) ("The fact finder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations of each party are realistic or weak and ill-defined."); *In re J.D.*, No. 02-18-00255-CV, 2019 WL 150292, at *3 (Tex. App.—Fort Worth Jan. 10, 2019, no pet.) (mem. op.); *In re I.L.*, No. 02-18-00206-CV, 2018 WL 5668813, at *7 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.).

**Acts or omissions and any excuses**

Father concedes that evidence of his choices leading to his incarceration weighs against him. But he contends that most of those choices were made before K.C. was even born and that "to pre[]maturely sever" her relationship with him—"when he has worked so hard to improve his ability to be a good father"—would not be in K.C.'s best interest. But not only could the trial judge appropriately consider evidence of Father's acts and omissions occurring before K.C.'s birth, that evidence shows that Father's choices resulted in his long-term incarceration that continued to negatively affect K.C. at the time of trial. *See, e.g., J.O.A.*, 283 S.W.3d at 345; *J.B.*, 2018 WL 3289612, at *5–6. Moreover, not all of the evidence pertinent to the best-interest analysis relates solely to those choices. Accordingly, the timing of Father's acts and omissions does not change that this factor nevertheless weighs against him.

**Majority of evidence weighs against Father**

Father argues that the evidence that he has learned about being a good parent while in prison, coupled with his strong desire to maintain a parent–child bond with K.C., mitigates the evidence that the best way for her to have permanency is for his rights to be terminated. But the trial court's consideration, and our review, of the evidence must focus on what is best for the child, not the parent. *See A.C.*, 560 S.W.3d at 631. The evidence shows that depriving K.C. of a stable, loving, permanent family for several years based on the mere possibility that Father will be able to establish a healthy relationship with K.C. from prison and thereafter apply the skills

18

he has learned upon his release, without subjecting her and her potential adoptive family to undue fear that he will disrupt the relationship she has established with them, would not be in K.C.'s best interest. *See J.B.*, 2018 WL 3289612, at *5–6.

We hold that the evidence is both legally and factually sufficient to support the trial court's best-interest finding; therefore, we overrule Father's two issues.

## Conclusion

Because we have overruled Father's two issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: January 23, 2020